JPL:JBD
F. #2025R00065

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
\*   MARCH 13, 2025   \*
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

OLEG BERETSKY,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. 25-CR-91
(T. 18, U.S.C., §§ 371, 982(a)(1),
982(a)(7), 982(b)(1), 1349, 1956(h), 2
and 3551 et seq.; T. 21, U.S.C., § 853(p);
T. 42, U.S.C., §1320a-7b(2)(B))

**Judge Joan M. Azrack**
**Magistrate Judge Joseph A. Marutollo**

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Defendant and Relevant Individuals and Entities</u>

        1.    The defendant OLEG BERETSKY was a resident of Huntington Station, New York. He was a registered nurse and President of OBEST, Inc. ("OBEST").

        2.    OBEST was a New York State corporation with its principal place of business located in Plainview, New York. The defendant OLEG BERETSKY founded OBEST on or about February 5, 2013. OBEST held itself out as a company that provided scheduling, marketing and related consulting services to doctors and other health care providers.

        3.    Agency 1, an entity the identity of which is known to the Grand Jury, was a not-for-profit entity that provided housing and other services to poor and low-income senior citizens in Brooklyn and Queens, New York.

        4.    Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was a resident of Huntington Station, New York, and an employee of Agency 1.

5. Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was a licensed clinical social worker with psychotherapy privileges in the State of New York.

6. Co-Conspirator 3, an individual whose identity is known to the Grand Jury, was a physician licensed to practice medicine in the State of New York.

7. Co-Conspirator 4, an individual whose identity is known to the Grand Jury, was a physician's assistant licensed in the State of New York who worked for Co-Conspirator 3.

8. Co-Conspirator 5, an individual whose identity is known to the Grand Jury, was a physician licensed to practice medicine in the State of New York.

9. Co-Conspirator 6, an individual whose identity is known to the Grand Jury, was a nurse practitioner licensed in the State of New York.

10. Co-Conspirator 7, an individual whose identity is known to the Grand Jury, was an employee of New York City Health + Hospitals Corporation and co-owner of Diagnostic Company 1, an entity the identity of which is known to the Grand Jury.

11. Co-Conspirator 8, an individual whose identity is known to the Grand Jury, was a physician licensed to practice medicine in the State of New York.

II. **The Medicare Program**

12. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

13. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and referenced in Title 18, United States Code, Section 1347, and Title 42, United States Code, Section 1320a-7b.

14. Medicare was divided into multiple parts. Medicare Part A covered health care services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered outpatient hospital services and professional services provided by physicians and other providers, including mental health services and occupational therapies (individually, "Provider," and collectively, "Providers").

15. CMS assigned each Provider a unique national provider identifier ("NPI") number. A Provider used its assigned NPI number when submitting claims for reimbursement to Medicare.

16. A Provider was required to be enrolled with Medicare in order to submit claims. To enroll in Medicare, a Provider was required to enter into an agreement with CMS in which the Provider agreed to comply with all applicable statutory, regulatory and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the Provider certified that the Provider understood that payment of a claim was conditioned on the claim and the underlying transaction complying with Medicare regulations, Medicare program instructions and federal law and on the Provider's compliance with all application conditions of participation in Medicare.

17. Providers were authorized to submit claims to Medicare only for services that were medically necessary, actually provided to the beneficiaries, and were not induced by illegal kickbacks and bribes.

18. In order to receive payment for a service covered by Medicare, the Provider was required to submit a claim for payment electronically or in writing. The claim required the Provider to identify, among other information: the Provider submitting the claim; the Provider providing the service; the beneficiary; the services rendered; the diagnosis or nature of the illness or condition treated and the date or dates of service.

19. Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented and actually provided as represented, and not induced by illegal kickbacks and bribes.

### III. The Defendant's Health Care Fraud and Money Laundering Scheme

20. From approximately January 2017 to April 2024, the defendant OLEG BERETSKY, together with others, engaged in a health care fraud and money laundering scheme in which he (a) solicited and received, and agreed to solicit and receive, kickbacks and bribes in return for referring patients to health care providers willing to pay for access to those patients, (b) billed, and agreed to bill, Medicare for services that were not provided and/or were induced by payments of illegal kickbacks and bribes, and (c) engaged in, agreed to engage in, transactions designed to conceal the proceeds of the scheme.

21. As part of the scheme, the defendant OLEG BERETSKY obtained from Co-Conspirator 1 information about Medicare beneficiaries who were typically elderly, Russian-speaking immigrants from the former Soviet Union who lived in housing provided by Agency 1. BERETSKY cultivated relationships with these individuals, as well as other Medicare beneficiaries (collectively, the "Beneficiaries") and held himself out as a health care professional who could coordinate and oversee the Beneficiaries' medical care on their behalf.

22. In furtherance of the scheme, the defendant OLEG BERETSKY solicited and received kickbacks from individual health care providers, including Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 5, Co-Conspirator 6, Co-Conspirator 7 and Co-Conspirator 8, in exchange for BERETSKY's providing those health care providers (the "Co-Conspirator Providers") with access to the Beneficiaries. In many cases, the Beneficiaries did not know that BERETSKY was referring them to the Co-Conspirator Providers and had neither requested nor consented to the treatments offered by the Co-Conspirator Providers.

23. In furtherance of the scheme and in exchange for the Co-Conspirator Providers' payment of bribes and kickbacks to the defendant OLEG BERETSKY, he arranged for the Co-Conspirator Providers, and others associated with them, to provide services to the Beneficiaries. For example, BERETSKY arranged for: (a) Co-Conspirator 2 to provide home visits to Beneficiaries for social-work services, (b) Co-Conspirator 3, Co-Conspirator 5, Co-Conspirator 6, Co-Conspirator 8, and others associated with their medical practices, to provide in-home medical visits to Beneficiaries, and (c) Co-Conspirator 7's company, Diagnostic Company 1, to provide at-home diagnostic services, including sonograms, to Beneficiaries.

24. The defendant OLEG BERETSKY and the Co-Conspirator Providers set and agreed to set the amounts of the kickback payments using various methods including on a per-beneficiary basis, per-beneficiary-schedule or batch basis, and as a percentage of fraudulent claim amounts reimbursed by Medicare.

25. In turn, the defendant OLEG BERETSKY, together with the Co-Conspirator Providers and others, submitted and caused to be submitted at least $22 million in false and fraudulent claims to Medicare for services purportedly provided on certain dates that were not provided at all, were not provided as billed, and/or were induced by the payment of

illegal kickbacks and bribes. Of the approximately $22 million in false and fraudulent claims that were billed to Medicare, Medicare paid claims of at least $12.4 million, which went to BERETSKY, the Co-Conspirator Providers and others.

26.  To promote the scheme, the defendant OLEG BERETSKY, together with others, took and agreed to take various other actions. For example, BERETSKY repeatedly directed Co-Conspirator 2 to bill Medicare for services that Co-Conspirator 2 never provided, including because the Beneficiaries who purportedly received the services were deceased. Moreover, while Co-Conspirator 2 was under an audit by CMS related to claims she submitted for services purportedly provided to Beneficiaries, BERETSKY and Co-Conspirator 2 agreed that BERETSKY would direct Beneficiaries who were likely to be contacted by CMS to tell CMS auditors that they received services from Co-Conspirator 2 when, in fact, they had not.

27.  As another example, Co-Conspirator 3 and others associated with his medical practice, including Co-Conspirator 4, agreed with the defendant OLEG BERETSKY to bill Medicare for services that were never provided to Beneficiaries or were not provided as represented, including because the Beneficiaries for whom services were billed refused those services. BERETSKY and Co-Conspirator 5 also agreed to bill Medicare for services that were never provided to Beneficiaries and for services that Co-Conspirator 5 never performed.

28.  As another example, when Co-Conspirator 6 withheld payment of bribes and kickbacks to the defendant OLEG BERETSKY and his associated entities in exchange for Beneficiary referrals, BERETSKY told at least one Beneficiary who continued seeing Co-Conspirator 6 for medical care that BERETSKY would take away that Beneficiary's Medicare if that Beneficiary continued to do so.

29. To promote the health care fraud scheme and to conceal the proceeds derived from it, the defendant OLEG BERETSKY, through OBEST, submitted fraudulent invoices to the Co-Conspirator Providers, and others associated with them, that purported to reflect services rendered. In those invoices, BERETSKY claimed to have performed a range of services, including "billing assistance," "phone call answering assistance," "marketing," "schedule management," and "driving arrangements." BERETSKY, however, either did not provide those services or used those services as a pretext to charge the Provider Co-Conspirators for referring Beneficiaries to them, as the total amounts on the invoices would typically match the pre-arranged amount that the Co-Conspirator Providers agreed to pay BERETSKY for illegal patient referrals.

30. The defendant OLEG BERETSKY also engaged in, caused, and agreed to engage in and cause, numerous financial transactions in order to further conceal the proceeds derived from the scheme. For example, BERETSKY caused wire transfers and check transactions of kickbacks and funds derived from the scheme to and between numerous accounts that he owned or controlled, directly and indirectly, including accounts held in the name of OBEST and one or more of BERETSKY's relatives.

31. To further conceal the proceeds of the scheme, the defendant OLEG BERETSKY also used, and directed the use of, intermediaries and cash payments to receive and transfer kickbacks. For example, BERETSKY directed Co-Conspirator 6 to stop paying kickbacks to BERETSKY directly, but instead through an intermediary. Similarly, BERETSKY directed Co-Conspirator 7 to stop paying kickbacks to BERETSKY directly, and instead directed Co-Conspirator 7 to pay those kickbacks to a relative of BERETSKY's.

32. In total, the defendant OLEG BERETSKY and his associated entities received at least $2.5 million in kickbacks and bribes from the Co-Conspirator Providers in exchange for referrals of the Beneficiaries, including:

(a) At least $150,000 from Co-Conspirator 2 between approximately June 2017 and October 2019;

(b) At least $74,000 from Co-Conspirator 3 between approximately August 2019 and September 2022;

(c) At least $375,000 from Co-Conspirator 5 between approximately June 2018 and March 2020;

(d) At least $125,000 from Co-Conspirator 7 between approximately December 2018 and May 2024;

(e) At least $245,000 from Co-Conspirator 8 between approximately April 2020 and May 2024.

## COUNT ONE
(Conspiracy to Pay and Receive Health Care Kickbacks)

33. The allegations contained in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

34. In or about and between January 2017 and April 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant OLEG BERETSKY, together with others, did knowingly and willfully conspire:

(a) to defraud the United States, by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of CMS, an agency of the United States, in its administration of Medicare;

(b) to solicit and receive any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring one or more individuals, to wit: Medicare beneficiaries, to one or more persons for the furnishing and arranging for the furnishing of any item and service for which payment made be made in whole or in part under a Federal health care program, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A);

(c) to offer and pay any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to one or more persons to induce such person to refer one or more individuals, to wit: Medicare beneficiaries, for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A); and

(d) to offer and pay any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to one or more persons to induce such person to purchase, lease, order and arrange for and recommend purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under a Federal health care program, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(B).

35. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant OLEG BERETSKY, together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a) On or about July 31, 2020, BERETSKY received a check in the approximate amount of $7,500, made payable to OBEST, from Co-Conspirator 6.

(b) On or about September 3, 2020, BERETSKY received an electronic payment in the approximate amount of $2,000, in an account in the name of OBEST, from Co-Conspirator 3.

(c) On or about September 4, 2020, BERETSKY received a check in the approximate amount of $5,013, made payable to OBEST, from Co-Conspirator 6.

(d) On or about April 12, 2022, BERETSKY sent Co-Conspirator 6 a false invoice that purported to provide "billing assistance," "preparation and management of daily schedules, caseloads, follow ups," "phone calls[,] answering assistance," and "marketing," among other services.

(e) In or about May 2022, BERETSKY threatened to have Medicare benefits taken from a Beneficiary if that Beneficiary continued to see Co-Conspirator 6, who refused to continue paying kickbacks to BERETSKY.

(f) On or about December 2, 2022, BERETSKY received an electronic payment in the approximate amount of $2,400, in an account in the name of OBEST, from Co-Conspirator 7.

(g) On or about November 20, 2023, BERETSKY received an electronic payment in the approximate amount of $1,200, in an account in the name of OBEST, from Co-Conspirator 7.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNTS TWO THROUGH NINE
(Receiving Health Care Kickback)

36. The allegations contained in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

37. On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant OLEG BERETSKY, together with others, did knowingly and willfully receive kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of Medicare beneficiaries to one or more individuals for the furnishing of and arranging for the furnishing of items and services for which payment may be made in whole or in part under Medicare, a federal health care program, as set forth below:

| Count | Approximate Date | Approximate Kickback Amount (Co-Conspirator Provider) |
|---|---|---|
| TWO | May 7, 2020 | $5,000 (Co-Conspirator 3) |
| THREE | July 31, 2020 | $7,500 (Co-Conspirator 6) |
| FOUR | September 3, 2020 | $2,000 (Co-Conspirator 3) |
| FIVE | September 4, 2020 | $5,013 (Co-Conspirator 6) |
| SIX | May 31, 2022 | $1,200 (Co-Conspirator 8) |
| SEVEN | September 12, 2022 | $400 (Co-Conspirator 8) |
| EIGHT | December 2, 2022 | $2,400 (Co-Conspirator 7) |
| NINE | November 20, 2023 | $1,200 (Co-Conspirator 7) |

(Title 42, United States Code, Section 1320a-7b(2)(B); Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT TEN
### (Conspiracy to Commit Health Care Fraud)

38.  The allegations contained in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

39.  In or about and between June 2017 and May 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant OLEG BERETSKY, together with others, did knowingly and willfully conspire to execute a scheme and artifice to defraud any health care benefit program as defined in Title 18, United States Code, Section 24(b), to wit: Medicare, and to obtain, by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT ELEVEN
### (Money Laundering Conspiracy)

40.  The allegations in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

41.  In or about and between December 2017 and May 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant OLEG BERETSKY, together with others, did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate and foreign commerce, which transactions in fact involved proceeds of specified unlawful activity, to wit: acts and activities constituting an offense involving a federal health care offense, in violation of Title 18, United States Code, Sections 371, 1347 and 1349, and Title 42, United States Code, Sections 1320a-

7b(b)(1)(A), (b)(2)(A) and (b)(2)(B), knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of such specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH TEN

42.     The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts One through 10, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of a federal health care offense to forfeit property, real or personal, that constitutes, or is derived directly or indirectly from, gross proceeds traceable to the commission of such offenses.

43.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(7) and 982(b)(1); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ELEVEN

44.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Eleven, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

45.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

s/
_____
FOREPERSON

By David Pitluck, Asst. U.S. Attorney
_____
JOHN J. DURHAM
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK